IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| KALVIN MICHAEL SMITH, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | 1:10-CV-29 |
| | ) | |
| TODD PINION, | ) | |
| | ) | |
| Respondent. | ) | |

## **MEMORANDUM OPINION AND ORDER**

Catherine C. Eagles, District Judge.

Petitioner Kalvin Michael Smith filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 on January 12, 2010. Respondent has filed a motion to dismiss. (Doc. 8.)[1] Because Mr. Smith's claims are untimely filed and he has not shown that he is equitably excused from complying with the limitations period, the motion to dismiss should be granted.

### BACKGROUND

Following a 1997 jury trial in Forsyth County Superior Court, Mr. Smith was convicted of armed robbery and assault with a deadly weapon with intent to kill inflicting serious injury. (Doc. 2 at 1.) The evidence at trial showed that, on December 9, 1995, Jill Lee Marker was assaulted in the Silk Plant Forest store in Winston-Salem, North Carolina. (Doc. 10-5 at 31-33.) Ms. Marker was unable to speak at trial, but testified by shaking her head "yes" or "no." (Doc.

---

[1] Citations are to the docket number and the PDF page numbers appended by the CM/ECF system to the bottom of each page in the record. The docket number at the bottom of the page and the docket number reflected in the docket entry do not always match up, for reasons not clear to the Court, but the Court has consistently used the numbers the CM/ECF system appends to the bottom of each page.

10-9 at 50-56.) Ms. Marker identified Mr. Smith as the man who hit her at the Silk Plant Forest. (*Id.* at 54.) She also testified that, before trial in 1997, police had shown her a blown-up picture of Mr. Smith along with about five other photographs and that she identified Mr. Smith as her attacker. (*Id.* at 55-56.)

Eugene Littlejohn testified that he went to the Silk Plant Forest with Mr. Smith in December 1995 because Mr. Smith needed to pick up some money. (*Id.* at 29-30.) He further testified that he witnessed Mr. Smith ask Ms. Marker for money and grab her by the arm with both hands. (*Id.* at 32-33, 40.) Mr. Littlejohn then left the store and went to Toys R Us. (*Id.* at 33-34.) He later saw Mr. Smith coming out of Toys R Us. (*Id.* at 34.) Mr. Littlejohn made conflicting statements about the time lapse and about also seeing Mr. Smith go into the store. (*Id.* at 35-36, 39.) Mr. Littlejohn also testified that, when he originally spoke with police, he told them only that he heard Mr. Smith talk about the incident with Andra Wilson and that he added a little more to his statement each time he spoke with the police after that. (*Id.* at 36-38.)

Ms. Wilson testified that Mr. Smith told her that "he had beat the lady at the Silk Plant Forest." (Doc. 10-8 at 42.) A few weeks later, Ms. Wilson was with Mr. Smith, Mr. Littlejohn, Pamela Moore, and "a guy named Freddie" when Mr. Smith brought up the incident again and joked that he had "beat the woman." (*Id.* at 43-44.) Ms. Moore testified similarly. (Doc. 10-9 at 11, 13-14.)

After his conviction, Mr. Smith was sentenced to consecutive terms of 145-183 months for the assault and 129-164 months for the armed robbery. (Doc. 2 at 1.) The North Carolina Court of Appeals affirmed Mr. Smith's convictions on December 15, 1998. (*Id.* at 2.) Mr. Smith did not seek further direct review. (*Id.* at 2-3.)

2

Case 1:10-cv-00029-CCE-LPA   Document 55   Filed 07/29/13   Page 2 of 19

On August 9, 1999, Mr. Smith filed a motion for appropriate relief ("MAR") in Forsyth County Superior Court. (*Id.* at 3.) The court denied his motion without a hearing on January 12, 2000. (*Id.*; Doc. 22-12.) On April 29, 2008, Mr. Smith filed a second MAR. (Doc. 2 at 4.) Following an evidentiary hearing, Mr. Smith moved to amend his MAR to add a claim alleging that the state failed to disclose Mr. Littlejohn's statement, deemed truthful during a polygraph examination, that he was not present in the Silk Plant Forest when Ms. Marker was robbed. (*Id.*; Doc. 20-15.) The court denied the motion to amend and denied his MAR on the remaining claims on May 21, 2009. (Doc. 2 at 4-5; Docs. 21-5, 22-2, 22-3.) The North Carolina Court of Appeals denied Mr. Smith's petition for writ of certiorari on September 11, 2009. (Doc. 23-10.)

On January 12, 2010, Mr. Smith filed this petition. (Doc. 2 at 1.) Mr. Smith claims that (1) the state failed to disclose favorable evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), (2) his conviction was tainted by the false testimony of Mr. Littlejohn and Ms. Moore, (3) Ms. Marker's testimony was a product of unduly suggestive pretrial procedures, making it constitutionally unreliable, and (4) trial counsel provided ineffective assistance. (Doc. 2 at 5-10.)

## ANALYSIS

### I.     Timeliness

Respondent moves to dismiss Mr. Smith's petition as untimely under the Antiterrorism and Effective Death Penalty Act ("AEDPA"). *See* 28 U.S.C. § 2244(d). Under AEDPA, a habeas petitioner has one year in which to file a § 2254 action, beginning from the latest of four dates:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

3

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

*Id.* § 2244(d)(1). Mr. Smith concedes that his petition would be untimely under the first three dates, but contends his petition is timely under the fourth. He contends that he could not have become aware of the factual predicates for his claims by the exercise of due diligence any earlier than August 30, 2007, which he contends is within the one-year limitations period, excluding the period during which his second MAR was pending. *See id.* § 2244(d)(1)(D), (d)(2).

Mr. Smith's § 2254 claims center on seven pieces of evidence: He claims *Brady* violations for the state's failure to disclose (1) a photographic lineup shown to Ms. Marker in 1996[2]; (2) Mr. Littlejohn's answers to his pretrial polygraph exam; and (3) the Toys R Us surveillance tape from the night of Ms. Marker's attack. Mr. Smith's undue suggestion claim also concerns the 1996 photographic lineup shown to Ms. Marker. Mr. Smith's ineffective assistance of counsel claims also arise from counsel's alleged failure to investigate the 1996 photographic lineup and the Toys R Us surveillance video, as well as (4) counsel's failure to challenge Ms. Marker's in-court identification of Mr. Smith and (5) counsel's failure to locate Freddie Reyes. Mr. Smith's claim that his conviction was tainted by false evidence is based on the recanted testimony of (6) Mr. Littlejohn and (7) Ms. Moore. For purposes of this motion, the

---

[2] This was an earlier photo lineup than the one about which Ms. Marker testified at trial, and it occurred less than a year after the attack.

Court will find that for Mr. Smith's petition to have been timely filed, he must show that each of these pieces of evidence was not discoverable by due diligence before August 30, 2007.[3]

### A. Photographic Lineup

Mr. Smith contends that in 1996, during the investigation of the robbery, the police showed Ms. Marker a photo array containing his picture and she did not identify him. He asserts that this was exculpatory evidence which should have been disclosed to him before his trial and that he did not become aware of this photo lineup until August 30, 2007. On that day, the district attorney sent Mr. Smith's lawyer[4] a letter stating that "we think it fair to conclude that Ms. Marker viewed an array containing the defendant and that she did not identify him. . . . [I]nformation about the [1996] line-up constitutes *Brady* material that should have been provided to the defense." (Doc. 2-9 at 2.)

#### i. *Brady* Claim

The factual predicate for the *Brady* claim could have been discovered by the exercise of due diligence before August 30, 2007. The 1996 photo lineup was videotaped. The MAR court found that trial counsel had viewed the entire video before trial. (Doc. 21-5 at 38-41, 47 at ¶ 60.)

---

[3] Mr. Smith's filing appears to be timely under this subsection only if he discovered the factual predicates for his claim no earlier than August 31, 2007, not August 30, 2007, as he contends. Working backwards, Mr. Smith filed his petition on January 12, 2010, 123 days after his petition for writ of certiorari was denied on September 11, 2009. Mr. Smith's second MAR was filed April 29, 2008. The period between April 29, 2008, and September 11, 2009, during which Mr. Smith's second MAR was pending, is excludable. *See* 28 U.S.C. § 2244(d)(2). With 242 days remaining in Mr. Smith's statutory limitations period, he must have discovered the factual predicates no earlier than August 31, 2007. Because Respondent does not challenge Mr. Smith's August 30, 2007, calculation and because, in any event, Mr. Smith could have discovered the factual predicates for his claims before August 30, 2007, the Court will use his date in this Order.

[4] Attorneys with Duke University's Innocence Project had undertaken review of Mr. Smith's case.

This finding is entitled to deference. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

Mr. Smith alleges that the finding was unreasonable, but he does not provide clear and convincing evidence to rebut the presumption of correctness. Instead, he contends that, even if he was given the full video before trial, the factual predicate of the claim could not have been discovered before the district attorney's letter. He argues that one cannot ascertain from watching the video the identities of the individuals in the photo array and that he did not know his photograph was in the photo array shown to Ms. Marker until he received the district attorney's letter.

"Due diligence does not require 'the maximum feasible diligence,' but it does require reasonable diligence in the circumstances." *Schlueter v. Varner*, 384 F.3d 69, 74 (3d Cir. 2004) (quoting *Moore v. Knight*, 368 F.3d 936, 940 (7th Cir. 2004)). The Court concludes that the exercise of reasonable diligence would have revealed and did reveal well before August 30, 2007, that Ms. Marker was shown Mr. Smith's picture in the 1996 photo lineup.

On seeing the video of the lineup, trial counsel could easily have investigated the identities of those in the photo array by asking the prosecutor or the detectives who conducted the photo lineup.[5] *See Schlueter*, 384 F.3d at 74 (finding petitioner failed to exercise due diligence where a fact could be discovered merely by interviewing someone). The Duke Innocence Project and post-conviction counsel received a copy of the video in January 2005, (*see* Doc. 24-3 at 2), and began investigating the identities of the individuals in the photo array at that

---

[5] In fact, trial counsel testified before the MAR court that he could not tell whether or not Ms. Marker had made a positive identification, either when he first viewed the video or in viewing it post-conviction, and that he did not consider the video to be helpful to his client. (Doc. 21-5 at 39-40, 45.) As noted *infra* Part II, the results of this first photographic lineup were ambiguous.

6

point. Mr. Smith gives no reason trial counsel could not have made similar efforts after viewing the video in 1997. (*See* Doc. 2-10 at 1-2.)

Mr. Smith "is confusing his knowledge of the factual predicate of his claim with the time permitted for gathering evidence in support of that claim." *Flanagan v. Johnson*, 154 F.3d 196, 199 (5th Cir. 1998). Per the MAR court's findings of fact, Mr. Smith knew about the 1996 photo lineup before his trial in 1997. He had access to the video of the photo lineup. Nothing happened in 2005, 2007, or 2009 to make it more important to find out what pictures were shown to the victim than it was in 1997. Mr. Smith had all of the vital facts underlying his *Brady* claim in 1997. *See McAleese v. Brennan*, 483 F.3d 206, 214 (3d Cir. 2007).

Moreover, in the August 30, 2007, letter, the district attorney wrote that a detective stated in an August 14, 2007, meeting attended by Mr. Smith's Duke representative that in 1996 he showed Ms. Marker a photo array containing Mr. Smith's picture. (Doc. 2-9 at 2.) Mr. Smith does not dispute this. Thus, there is nothing in the district attorney's August 30 letter that Mr. Smith did not know before August 30, 2007. Even assuming Ms. Marker's failure to identify Mr. Smith in the 1996 photo lineup was not discoverable by due diligence any earlier, Mr. Smith at least would have known the information by August 14, 2007. Accordingly, the factual predicate for Mr. Smith's *Brady* claim based on the photographic lineup is untimely.

    ii.    **Undue Suggestion Claim**

Mr. Smith contends that Ms. Marker's in-court identification of him as her attacker was the product of an unduly suggestive pretrial process. To the extent Mr. Smith contends that the 1997 lineup, the publicity surrounding the attack and his arrest, and Ms. Marker's mental and physical condition improperly influenced her in-court identification, he does not dispute that he knew about those things before trial. To the extent Mr. Smith bases this claim on the 1996

7

lineup alone or in combination with anything he knew about at trial, it is untimely. As soon as Mr. Smith became aware of the video—in 2005, at the latest—and that his picture was included—on August 14, 2007, at the latest—he would have had enough information to bring this claim. *See* discussion *supra* Part I.A.i.

### iii. Ineffective Assistance of Counsel Claim

The second MAR court found as a fact that Mr. Smith had enough information to raise in his first MAR his claim that counsel was ineffective for not determining whether Mr. Smith's photo had been shown to Ms. Marker. (Doc. 21-5 at 53.) This finding of fact is entitled to deference, and Mr. Smith has not provided any evidence, much less clear and convincing evidence, to rebut the presumption of correctness.

Moreover, it was obvious at Mr. Smith's trial that Ms. Marker's identification of him as her attacker was a crucial part of the state's case. He challenged Ms. Marker's in-court identification of him on appeal to the North Carolina Court of Appeals, (Doc. 10-11 at 27), and he raised several claims in connection with the in-court identification, including ineffective assistance of counsel, in his first MAR. (Doc. 22-9 at 7.) Even if he was unaware of the video when he filed his first MAR, Mr. Smith thus would have recognized the significance of the video of the 1996 lineup for impeachment purposes and its relevance to an ineffective assistance of counsel claim as soon as he became aware of its existence in 2005, at the latest. *See* discussion *supra* Part I.A.i. Accordingly, this claim is untimely.

### B. Polygraph Answers

Mr. Smith contends that he did not know of Mr. Littlejohn's statement during a 1997 polygraph examination that he was not at the Silk Plant Forest when Ms. Marker was robbed until the state disclosed that statement in the January 2009 hearing before the MAR court. The

8

MAR court found that, before trial, Mr. Smith was provided with the results of Mr. Littlejohn's polygraph examination and the supplemental report, which indicated that Mr. Littlejohn answered that he did not participate in the robbery, receive money or material items, or plan or scheme to rob the Silk Plant Forest. (Doc. 22-3 at 3-4.) This factual finding is entitled to deference. *See* 28 U.S.C. § 2254(e)(1); discussion *supra* Part I.A.

Mr. Smith argues that this Court should not defer to the MAR court's finding because the claim was not adjudicated on the merits. *See Monroe v. Angelone*, 323 F.3d 286, 297 (4th Cir. 2003). This is a mischaracterization of the law. When a state court has not adjudicated a claim on the merits, the federal courts review "questions of law and mixed questions of law and fact . . . de novo." *Weeks v. Angelone*, 176 F.3d 249, 258 (4th Cir. 1999), *aff'd*, 528 U.S. 225 (2000). The state's factual findings, however, are still presumed to be correct, and that presumption must be overcome by clear and convincing evidence. *See, e.g.*, *Conner v. McBride*, 375 F.3d 643, 655 (7th Cir. 2004) (distinguishing *Weeks* and holding that state court's factual finding, "which obviated the need to rule upon the substantive merits" of petitioner's claim, was entitled to § 2254(e)(1) deference); *Graham v. Hunt*, No. 5:06-HC-2217-BO, 2008 WL 474347, at *2 (E.D.N.C. Feb. 15, 2008).

Mr. Smith has not rebutted the presumption by clear and convincing evidence. He contends that the MAR court ignored that the polygraph examination report and supplemental report do not indicate that Mr. Littlejohn answered "no" to the question, "Were you present in the Silk plant [sic] Forest when the clerk was robbed?" (Doc. 29 at 10.) However, this is merely a rephrasing of the information contained in the originally disclosed polygraph report and by Mr. Littlejohn at trial. As the MAR court noted, Mr. Littlejohn never testified that he was present for the completion of the crime or that he participated in the robbery. (*See* Doc. 10-9 at 32-34; Doc.

9

22-3 at 5.) The answers disclosed during the January 2009 hearing provide no more information than was discovered during Mr. Smith's trial, at the latest. Accordingly, they do not constitute a factual predicate newly discovered in January 2009, and Mr. Smith's *Brady* claim relying on them is untimely.

### C. Toys R Us Surveillance

Mr. Smith also contends that he first became aware at the January 2009 evidentiary hearing that a Toys R Us surveillance tape showed that neither he nor Mr. Littlejohn entered the store on the night of the attack.

#### i. *Brady* Claim

The MAR court found that Mr. Smith knew that the videotape existed before trial and that there was "no evidence . . . that the videotape was withheld from him before or during trial." (Doc. 20-4 at 18.) These findings are entitled to deference, *see* discussion *supra* Parts I.A, I.B, and Mr. Smith does not appear to contend that they are unreasonable. Indeed, he referenced the Toys R Us tape in his second MAR, filed in 2008, (*see* Doc. 2-3 at 1; Doc. 20-4 at 5), which would seem to conclusively establish he was aware of it before the January 2009 hearing.

Instead, Mr. Smith contends that "[m]ere knowledge that the surveillance video existed is insufficient to prove that the video contained favorable evidence" and that he could not discover the factual predicate for this claim until he discovered that the state had viewed the tape a second time. (Doc. 29 at 13.) The law does not require that the prosecution point out exculpatory evidence to the defense; it merely requires that the evidence be made available to the defense. *See United States v. King*, 628 F.3d 693, 702 (4th Cir. 2011) ("[T]he Government need only *disclose* exculpatory evidence, not ensure that the defense further develop and utilize that evidence."). Mr. Smith knew that the video recorded events occurring on the night of the attack

10

in the shopping center where the attack took place. Although, on first viewing, the detectives concluded that the videotape was of no evidentiary value to the state, that is not a conclusion that is binding on Mr. Smith; Mr. Smith has cited no law, and the Court finds none, that would require the state to notify the defendant every time it examines evidence or reevaluates the value of evidence.

The potential relevance of the surveillance video of the store right next door to the location of the assault was as obvious in 1996 and 1997 as it was in 2005, when Mr. Smith's lawyers began asking about it. Mr. Smith presumably knew whether he was at Toys R Us on the night in question, so that if he was not, the potential relevance of the video would have been heightened. *See Fullwood v. Lee*, 290 F.3d 663, 686 (4th Cir. 2002) (finding no *Brady* violation based on defendant's conversation with detective because defendant knew about the conversation and its subject); *Hairston v. Beck*, 345 F. Supp. 2d 535, 538 (M.D.N.C. 2004) (Dixon, M.J., recommendation, adopted by Osteen, J.) (finding defendant was not entitled to a later date under § 2244(d)(1)(D) based on officer's affidavit suggesting that no weapon was involved because defendant knew whether he was carrying a gun). At the latest, Mr. Littlejohn's trial testimony, (Doc. 10-8 at 25, 33-35), should have put Mr. Smith on notice that his presence or absence at the Toys R Us was relevant and, thus, that the video was also relevant. *See, e.g.*, *Wood v. Spencer*, 487 F.3d 1, 5 (1st Cir. 2007) (holding testimony that victim spoke to police officer on the day of her death sufficient to give notice of conversation even though prosecutor did not provide information about the conversation).

### ii.    Ineffective Assistance of Counsel Claim

As stated above, Mr. Smith knew about the video at trial when its relevance and potential exculpatory value became obvious. This is particularly so since Mr. Smith presumably knew

11

whether he was or was not at Toys R Us on the night of the attack, and thus he had personal knowledge of whether the video was likely to be exculpatory. He also would have been aware at trial that counsel did not cross-examine Mr. Littlejohn about the surveillance video. Under the circumstances, Mr. Smith could have exercised due diligence to inquire further into trial counsel's investigation of the surveillance tape at any point after trial. This claim is untimely.

### D. Ms. Marker's In-Court Identification

In response to the motion to dismiss, Mr. Smith does not appear to contend that this ineffective assistance of counsel claim is timely. Indeed, Mr. Smith unquestionably knew at trial that counsel did not challenge Ms. Marker's in-court identification. *See Owens v. Boyd*, 235 F.3d 356, 359 (7th Cir. 2000) ("[T]he time commences when the factual predicate could have been discovered through the exercise of due diligence, not when it was actually discovered by a given prisoner. . . . [T]he trigger in § 2244(d)(1)(D) is (actual or imputed) discovery of the claim's factual predicate, not recognition of the facts' legal significance." (internal quotation marks omitted)). This claim is untimely.

### E. Freddie Reyes

Likewise, Mr. Smith makes no argument as to the timeliness of his claim that counsel was ineffective for failing to locate Freddie Reyes to testify. (*See* Doc. 2-10; Doc. 29.) Indeed, that claim is not timely, as Mr. Smith could have discovered the factual predicate no later than during trial, when Ms. Wilson and Ms. Moore testified that they were all with "Freddie" when Mr. Smith told them he had "beat the woman" and counsel did not call Mr. Reyes. (Doc. 10-8 at 44; *see* Doc. 10-9 at 11).

### F. Mr. Littlejohn's Testimony

12

Mr. Smith appears to argue that he did not discover the factual predicate underlying his false evidence claim based on Mr. Littlejohn's trial testimony until the January 2009 hearing, when he discovered that the state knew that Mr. Littlejohn answered "no" to the polygraph question whether he was present for the robbery. Essentially, he contends that the factual predicate for this claim is the state's knowledge that Mr. Littlejohn was testifying falsely, which he did not discover until the January 2009 hearing.

As stated above, Mr. Littlejohn's answers to the polygraph did not contradict his trial testimony or the original polygraph reports; accordingly, they do not show that the state knew that Mr. Littlejohn's trial testimony was false and cannot serve as the factual predicate for this claim. Moreover, Mr. Smith appears to have believed that the state knowingly presented Mr. Littlejohn's false testimony as early as the filing of his first MAR, filed in 1999, in which he brought an identical claim. (Doc. 22-9 at 6.) This claim is untimely.

### G. Ms. Moore's Testimony

Mr. Smith does not argue that his false evidence claim based on Ms. Moore's testimony is timely. Nor does he attempt to establish a date on which the factual predicate for this claim—specifically that the state presented Ms. Moore's testimony despite knowing that it was false—became known to him. Accordingly, Mr. Smith has not met his burden. *See, e.g.*, *Huneycutt v. Neely*, No. 1:12CV1052, 2013 WL 1703561, at *3 (M.D.N.C. Apr. 19, 2013) (collecting cases); *Worley v. North Carolina*, No. 3:09CV484-3-MU, 2009 WL 4611473, at *2 (W.D.N.C. Dec. 1, 2009). This claim is untimely.

## II. Actual Innocence Exception

Alternatively, Mr. Smith contends that his untimely filing should be excused because he presents a credible claim of actual innocence based on the recanted testimony of Mr. Littlejohn

13

and Ms. Moore, Ms. Marker's alleged failure to identify Mr. Smith in the 1996 photographic lineup, the Toys R Us surveillance video, and a statement made by Mr. Reyes that he never heard Mr. Smith confess.[6]

Recently, the Supreme Court recognized in *McQuiggin v. Perkins*, ___ U.S. ___, ___, 133 S. Ct. 1924, 1928 (2013), an actual innocence exception to AEDPA's time limitations. To establish actual innocence, "a petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Schlup v. Delo*, 513 U.S. 298, 327 (1995); *see McQuiggin*, ___ U.S. at ___, 133 S. Ct. at 1935. "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324.

Mr. Smith's evidence does not establish his innocence. In *McQuiggin*, the Supreme Court found insufficient three affidavits which offered very strong evidence that someone other than the defendant committed the crime. *McQuiggin*, ___ U.S. at ___, 133 S. Ct. at 1936. One was from a witness who heard the other person confess and saw the other person in bloody clothes on the night of the murder, and another was from a dry cleaner's employee who took bloody clothes from the other person on the day after the murder. *Id.* at ___, 133 S. Ct. at 1929-

---

[6] To the extent Mr. Smith raises new factual claims in his supplemental briefs, the Court will not address them. The Court's May 29, 2013, Order clearly directed the parties to submit supplemental briefing to address the effect of the Supreme Court's decision in *McQuiggin v. Perkins*, ___ U.S. ___, ___, 133 S. Ct. 1924, 1928 (2013), and any other recently decided relevant cases. (Doc. 43.) This was not an invitation to raise new, untimely grounds for relief. *See* Rules Governing Section 2254 Cases, Rule 2(c)(1) ("The petition must . . . specify all the grounds for relief available to the petitioner."); *see, e.g.*, *Gaultney v. Ballard*, No. 1:09-cv-01221, 2012 WL 6044412, at *2 (S.D.W. Va. Dec. 5, 2012) (collecting cases).

30. None of Mr. Smith's evidence comes close to being as exculpatory; it does not identify someone else as the attacker, nor does it exonerate Mr. Smith.

The MAR court made a number of factual findings about the 1996 photo lineup and the related video. Ms. Marker was in poor physical condition when she viewed the 1996 photo lineup. (Doc. 21-5 at 47.) The detective held the photos to Ms. Marker's left side, closer to the eye blinded during the attack, and she was not wearing her glasses. (*Id.* at 34.) The MAR court found that it was apparent from the video that Ms. Marker could not clearly see the photos that were shown to her. (*Id.* at 34, 47.) It was because of these flaws in the lineup and not some other reason more probative of Mr. Smith's guilt or innocence that the MAR court found that the video showed that Ms. Marker failed make a clear identification. (*Id.* at 47.) Relatedly, the MAR court concluded that the "videotape would have been of little or no value to Defendant." (*Id.* at 47.) These factual findings are entitled to deference and are inconsistent with petitioner's arguments.

In his supplemental brief, Mr. Smith argues that these findings should not be presumed correct because they "have been drawn into serious question" by two investigative reports of Mr. Smith's criminal case and because "the integrity of [Mr. Smith's second MAR proceeding] was tainted by the continued participation of an Assistant District Attorney whose office had formally recused itself . . . and who, before the MAR evidentiary hearing, procured and secretly used a false affidavit" stating that a first responder heard Ms. Marker identify her attacker as black. (Doc. 44 at 6-7.)

First, the two reports are not in evidence. Neither party to this case proffered these reports into evidence, and they were mentioned by a party for the first time in Mr. Smith's supplemental brief. One, the Swecker Report, has been submitted to the Court by amicus, (*see*

15

Doc. 41-1), but is not appropriate for judicial notice. Mr. Smith directs the court to a website for the other, (*see* Doc. 44 at 3 n.2), but provides no argument as to why that report is admissible. As stated above, the Court's request for supplemental briefing was not aimed at the submission of new evidence. *See supra* note 7.

In any event, neither report nor any allegedly false affidavit regarding Ms. Marker's on-the-scene comments have any bearing on the MAR court's assessment of the video. The MAR judge independently viewed the video of the 1996 photo lineup, and Mr. Smith does not contend, nor does the Court's review reveal, that anything in the reports suggests impropriety in the MAR court's analysis. Similarly, nothing about Ms. Marker's on-the-scene comments could call into question the MAR court's first-hand analysis of an entirely different event.

The remaining evidence that Mr. Smith relies on to claim actual innocence at most calls into question the credibility of Mr. Littlejohn and Ms. Moore, neither of whom testified as an eyewitness. Mr. Littlejohn's credibility was already in question at trial, where he testified inconsistently and admitted to giving inconsistent statements to police before trial. The jury's verdict was not based only on testimony of Mr. Littlejohn and Ms. Moore; in addition, the jury had before it Ms. Marker's 1997 out-of court identification of Mr. Smith, her in-court identification, and Ms. Wilson's testimony that she heard Mr. Smith admit to beating Ms. Marker several times. Nowhere in this petition does Mr. Smith challenge Ms. Wilson's testimony.

Moreover, the state had additional inculpatory evidence that provided additional support for the verdict, including Mr. Smith's confession, which it did not put before the jury; had the allegedly exculpatory evidence discussed above been proffered, the prosecution likely would have put additional evidence before the jury, as the MAR court found with regard to the 1996 photographic lineup. (*See* Doc. 21-5 at 45, 50, 55-56); *see also House v. Bell*, 547 U.S. 518, 537

("*Schlup* makes plain that the habeas court must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted . . . ." (internal quotation marks omitted)). Mr. Smith's "new" evidence does not make it more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt.

In his supplemental brief, Mr. Smith also claims that the two investigative reports support his claim for actual innocence. First, as stated above, the Court concludes that neither report is in evidence and neither should be considered. In the alternative, even if they are considered, they are insufficient to establish Mr. Smith's innocence. They merely reflect opinions differing from those of the MAR court and doubting the adequacy of the police investigation and the reliability of several pieces of evidence presented by the state. They do not present any new evidence that would tend to establish Mr. Smith's innocence. In fact, the report purportedly commissioned by the Winston-Salem City Council was directed toward reforming police procedures, and the committee was told not to make any findings of guilt or innocence. Similarly, the Swecker Report explicitly states that it "does not presume to exonerate Kalvin Michael Smith." (Doc. 41-1 at 18.) Though it recommends a new trial, it does not even suggest that Mr. Smith would not be convicted in view of the full record. Neither report is anywhere near as exculpatory as the evidence disapproved of in *McQuiggin*, which pointed directly to another person as the perpetrator. *McQuiggin*, ___ U.S. at ___, 133 S. Ct. at 1929-30.

Nor is Mr. Smith entitled to an evidentiary hearing to develop his actual innocence claim. In evaluating a request for an evidentiary hearing, a district court "should consider the particular facts raised by the petitioner in support of his actual innocence claim." *Teleguz v. Pearson*, 689 F.3d 322, 331 (4th Cir. 2012). Mr. Smith has not raised any facts that would entitle him to further exploration of his actual innocence claim. In addition to its findings regarding the video,

the MAR court found incredible the recantations of Mr. Littlejohn and Ms. Moore. (*See* Doc. 21-5 at 15, 18.) The investigative reports Mr. Smith references in his supplemental brief do not constitute clear and convincing evidence to rebut the presumption of correctness as to these findings. At most, they show that the evidence before the MAR court is subject to multiple interpretations; they do not show that the MAR court's interpretation was wrong.

In the absence of clear and convincing evidence, it would be improper for the Court to second-guess the state court's findings. *Cf. Teleguz,* 689 F.3d at 331 ("[T]he district court is permitted under *Schlup* to make some credibility assessments when . . . a state court has not evaluated the reliability of a petitioner's newly presented evidence that may indeed call into question the credibility of the witnesses presented at trial." (internal quotation marks and alterations omitted)). Moreover, as stated above, even assuming the credibility of Mr. Littlejohn's and Ms. Moore's recantations, it is not more likely than not that no reasonable juror would have convicted Mr. Smith.

### III. Conclusion

Mr. Smith did not file his § 2254 petition within the one year of discovering the factual predicates for his claims, and they are untimely under AEDPA. Mr. Smith is not entitled to an equitable excuse based on a claim of actual innocence.

Finding no substantial issue for appeal concerning the denial of a constitutional right affecting the conviction, nor a debatable procedural ruling, the Court will deny a certificate of appealability. *See* 28 U.S.C. § 2253(c)(2); Habeas Corpus Rule 11(a).

It is therefore **ORDERED** that Respondent's motion to dismiss, (Doc. 8), is **GRANTED** and the petition is **DISMISSED**. A certificate of appealability shall not issue. It is further

**ORDERED** that Respondent's Motion to Deem Response to Supplemental Briefing Timely Filed, (Doc. 51), is **GRANTED**.

This the 29th day of July, 2013.

                                              UNITED STATES DISTRICT JUDGE